## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**CHRISTOPHER MILLER.,**

      **Plaintiff,**

**v.**                                    **Case No.: 3:03-cv-812-J-99MMH**

**MORRIS COMMUNICATION**
**COMPANY d/b/a Florida**
**Times-Union,**

      **Defendant.**

_____

## O R D E R

    Before the Court for consideration is a vast array of motions filed by both Parties.  First,

Plaintiff filed his Motion for Partial Summary Judgment on his Defamation claim. (Doc. No. 171, filed

March 31. 2005).  On April 14, 2005. Defendant filed its own Cross-Motion for Summary Judgment on

the Defamation count (Doc. No. 173) and responded in opposition to Plaintiff's motion. (Doc. No.

174).  Defendant then filed a larger Summary Judgment Motion against Plaintiff's entire Complaint on

April 22, 2005. (Doc. No. 182).  In response, Plaintiff moved to Quash Defendant's Exhibits (Doc. No.

184, filed April 22, 2005) and filed a memorandum in opposition to Defendant's Summary Judgment

Motion. (Doc. No. 197, filed May 11, 2005).  Defendant opposes the motion to quash its exhibits.

(Doc. No. 188, filed April 26, 2005).  Plaintiff also filed a Motion for Summary Judgment on his

Invasion of Privacy Claim. (Doc. No. 186. filed April 26, 2005).  Defendants oppose this Motion as

well. (Doc. No. 195, filed May 10, 2005).  In addition to these dispositive motions, Plaintiff has filed

two Motions for Rule 11 Sanctions. (Doc. No. 214, filed June 13, 2005 and Doc. No. 226, filed June

27, 2005).  Defendant responded in opposition on July 8, 2005. (Doc. No. 229).  Finally, Defendant

filed a Motion to Require Plaintiff to Obtain Leave of Court Before Filing Further Motions or Related

Lawsuits. (Doc. No. 220, filed June 21, 2005). Plaintiff, of course, opposes this Motion. (Doc. No.

232, filed July 12, 2005). On the day the Court finalized and entered this Order, Plaintiff filed a

Motion to Compel and for Sanctions (Doc. No. 241, filed July 22, 2005) and an Emergency Motion for

Relief from Judgment or Order (Doc. No. 243, filed July 22, 2005).

## I. Factual Background

This case has endured a tortured history, full of disputes and uncooperative behavior by both

Parties. In large part, Plaintiff's complaints center around his disability and how it was handled by

Defendant. Specifically, Plaintiff, while an employee of Defendant corporation, was diagnosed with

and continues to suffer from bi-polar disorder.

The Parties' mutual dislike began when Plaintiff was employed in the Sports Department of one

of Defendant corporation's newspapers - The Florida Times-Union Newspaper.[1] Plaintiff had

continuing disagreements with his supervisors Chet Fussman and Mark Lawrence. (Ex. A to Doc. No.

174). He complained to various supervisors, both orally and via email or written letter, that he thought

Fussman and Lawrence were "unqualified and incompetent department editors" who were "totally

worthless." Id.; see also Plaintiff Depo. at 140-47. Plaintiff characterizes one of the complaints he

made in September of 2000 as a request for reasonable accommodation under the Americans with

Disabilities Act. (Plaintiff Depo. at 140).

During the spring of 2001, Plaintiff took short term disability leave pursuant to the Family

Medical Leave Act. In order for Plaintiff to receive short term disability benefits, a Disability Benefits

Request form was required to be filled out. Plaintiff alleges, and Defendant denies, that Defendant

---

[1] For purposes of this motion, "Defendant" means the corporation Morris
Communications Co, LLC doing business as The Florida Times-Union. The Court will not make
distinctions.

forged his signature on the form and faxed it to his doctor. See Ex. 2 to Doc. No. 186.  Plaintiff's

doctor, in response, submitted a Provider Statement that described Plaintiff's illness as "major

depression, severe, recurrent." (Ex. 4 to Doc. No. 186).  Plaintiff received $3,400.71 in short term

disability benefits from Defendant's insurance provider, Aetna.

During the same time period in which Plaintiff was out of work, in meetings among

Defendant's editors, it was decided that Plaintiff would be transferred to the News Department as a

Copy Editor. (Holmes Aff. at ¶ 5).  Upon learning of this impending transfer, the Managing Editors,

Carole Fader and Mike Richey, were informed that two Copy Editors, Molly Strain and Claire Hozier,

had complained about Plaintiff's behavior and requested that he not be transferred to their department.

Id. at ¶¶ 6-7.

In April of 2001, while still employed by Defendant but on disability leave, Plaintiff submitted

a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination

on the basis of his disability.  Nothing came of this complaint.[2]  While Plaintiff believes that Defendant

had to know that he filed this complaint, he has not produced any evidence to demonstrate such

knowledge.

While Plaintiff was on short term disability leave, he negotiated a Separation Agreement with

Carol Holmes, the Director of Human Resources for Defendant corporation.[3] (Holmes Aff. at ¶ 9).  The

Agreement provided, among other things, that in exchange for Plaintiff's voluntary resignation as of

June 30, 2001, Defendant would pay "a total sum of $25,987.00, an amount to which he is not

---

[2] Concerning his first EEOC complaint, Plaintiff testified that "I don't think it was actually filed.  The guy got it.  Basically what happened was the man received it at the EEOC." (Plaintiff's Depo. at 147).

[3] During Plaintiff's employment with Defendant, Carol Holmes was known as Carol Kuehner. (Holmes Affidavit at ¶ 2).

otherwise entitled." (Doc. No. 1 at pp. 11-13).  The agreement explained that this amount "represents a 'grossed-up' separation payment minus a deduction for an existing garnishment against Miller's wages." Id.  In addition, Plaintiff agreed to waive any and all claims he had against Defendant arising from his employment, the circumstances surrounding his resignation, and based on various federal anti-discrimination statutes including the ADA. Id.  Moreover, Plaintiff acknowledged that he entered into the agreement without reliance on any statement or representation other than those contained in the text of the agreement and he promised not to seek further employment with any affiliate newspapers of Defendant corporation. Id.

Both before and after Plaintiff resigned, he interviewed at other newspapers.  While still employed with Defendant, he interviewed for a position at the Orlando Sentinel. (Plaintiff Depo. at 192-93).  Plaintiff alleges that, without disclosing the information himself, the interviewer, Van McKenzie, asked him questions about his illness. Id. at 193-94.  According to Plaintiff, he had only told his direct supervisors of his diagnosis and, at this time, had not told all the members of his family. Id.

After his termination, Plaintiff interviewed at several newspapers, but was not hired by any of them.  One of his interviews was in connection with a job opening at the Athens Banner Herald in Athens, GA, which, like the Florida Times-Union, is a newspaper owned by Morris Communications Company.  Plaintiff thought the interview went well, but he was denied the job on November 16, 2002.  He also contends that a friend of his. Brad Zimanek, informed Plaintiff via email that Martha Thomas, Director of Human Resources for the Athens Banner-Herald, told Zimanek that Miller was not hired "Because of his current situation with litigation against a newspaper in our company." (Exhibit 8 to Doc No. 183).  According to Plaintiff, he did not get a job offer from any newspaper he interviewed with because of negative references given by employees of Defendant.  He has not, however, put

forward evidence of a negative reference or who exactly gave one.

Plaintiff has also had a tumultuous relationship with Defendant's counsel.  In the summer of 2003, Plaintiff filed complaints with the State Bar of Georgia alleging ethical violations on the part of Fisher & Phillips.  When responding to Plaintiff's complaints, each attorney described his or her involvement with the case and the prior ADA settlement and, in so doing, identified Plaintiff's illness. (Ex. 6 to Doc. No. 186).  Plaintiff contends that this disclosure to the Georgia Bar was unethical and an unlawful invasion of privacy.

During the summer of 2003, Plaintiff began barraging Defendant, its management and employees, and defense counsel with emails and letters concerning wrongs he perceived and legal action he was considering.  Specifically, between June 20, 2003 and July 20, 2003 Plaintiff sent more than one hundred emails to Defendant's offices.[4]  In one of these email messages, he told numerous employees that he would be contacting them concerning a potential lawsuit and that each of them would "likely be subpoenaed at some point in the future to respond to questions under oath." (Ex. I to Doc. No. 174).  Moreover he preemptively apologized "for the fact that you all may have to endure some difficult and odd situations in the near future." Id.  Defendant contends that many of the emails and letters to both Defendant and its counsel were laced with hatred, anger, bitterness, and thinly veiled threats.  Plaintiff counters that no direct threats were ever made in his correspondence with Defendant.

According to the testimony of Ms. Holmes, based on the tone, frequency, and sheer number of messages received from Plaintiff, she was concerned that he might cause a disturbance or a physical confrontation on Defendant's premises.  (Holmes Aff. at ¶¶ 10-12).  In response, she and Robert Woods, Supervisor of Security, created an 8 ½ x 11 bulletin with a photograph of an unsmiling

---

[4] Defendant explained that many of these emails were sent to more than one person and so the total number of emails sent could be considered much higher than 104.

Plaintiff. Over the photo of his face were the words "Be On the Alert." The bulletin, which Plaintiff views as akin to a criminal "Wanted Poster," warned that Plaintiff was not allowed to enter the building and if he refused to leave, employees were instructed to call 911 to reach the Jacksonville Sheriff's Office. Both Ms. Holmes and Mr. Woods testified that the bulletin was intended to be kept in a manila folder behind the guard shacks and reception desk. (Holmes Aff. at ¶ 12; Woods Aff. at ¶¶ 4-5). In addition, the bulletin was only supposed to be visible to security staff and receptionists. Id. It is undisputed, however, that the poster was hung at some point on the employee bulletin board located at the rear employee entrance and that this entrance was also accessed by some non-employee members of the public. When Ms. Holmes learned that the poster was hung on the bulletin board, she removed it. (Holmes Aff. at ¶ 13 ; Woods Aff. at ¶ 8). The poster was first hung in the summer of 2003 for approximately one month and was then hung for a brief time again in the spring of 2004.

Based on these facts, Plaintiff has sued under several theories including retaliation in violation of the ADA, breach of contract, breach of the duty of good faith and fair dealing, invasion of privacy, tortious interference with prospective business relationship, intentional infliction of emotional distress, fraud, and defamation. As will be discussed in great detail below, Plaintiff fails on each of these counts.

## II. Standard of Review

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Clark v. Coats &

Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). When a moving party has discharged its burden, the nonmoving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the nonmovant, Key West Harbor v. City of Key West, 987 F.2d 723, 726 (11th Cir. 1993), and resolve all reasonable doubts in that party's favor. Spence v. Zimmerman, 873 F.2d 256, 257 (11th Cir. 1989).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the Court should not grant the summary judgment motion. Augusta Iron and Steel Works v. Employers Insurance of Wausau, 835 F.2d 855, 856 (11th Cir. 1988). It must be emphasized that the mere existence of some alleged factual dispute will not defeat an otherwise properly supported summary judgement motion. Rather, "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

## III. Discussion

### A. Plaintiff's Motion to Quash

As an initial matter, the Court will take up Plaintiff's Motion to Quash Defendant's Exhibits and Affidavits (Doc. No. 184) submitted with its Summary Judgment Motion. (Doc. No. 182). In his

motion, Plaintiff contends that various emails and letters written by him as well as an affidavit from

Carol Holmes are improper and should be stricken from the record.

Exhibits A, B, C, D, F, G, and H are email messages written by Plaintiff and sent to employees

or officers of Defendant corporation.  Specifically, Exhibits A through D are emails from Plaintiff to

his former supervisors Mike Richey, Chet Fussman, and Carl Cannon, and Exhibits F through H are

messages sent to Defendant's President William S. Morris, IV.  Defendant employs these email

messages, at least in part, to explain its creation of the security bulletin bearing Plaintiff's photo.

Because the tone, volume, and frequency of the messages were, according to Defendant, filled with

anger and bitterness, Defendant's managers decided that Plaintiff should be banned from the property.

Plaintiff, however, contends that Defendant never produced these email messages in response to his

interrogatories seeking disclosure of whatever documents were the catalyst for the security bulletin.

Defendant cannot now, argues Plaintiff, rely on them in its Motion.  The Court disagrees.

First, no Order coming out of a myriad of discovery disputes specifically required Defendant to

produce email messages Plaintiff sent to Defendant's employees or officers.  After being required to

"identify the other communications" on which it based its decision to create and post the security

bulletin (Order No. 136, filed December 27, 2005), Defendant was required to "include the names of

the individuals who allegedly complained to management about Plaintiff." (Order No. 168, filed March

15, 2005).  After Defendant apparently did so, Plaintiff again sought clarification of its interrogatories.

Defendant was then required to "produce all communications between Defendant and its employees

from June 30, 2001, to the present that relate to Plaintiff....Defendant must also include

communications between all employees, not merely Defendant's executives, if those communications

reference or relate to Plaintiff." (Order No. 179, filed April 22, 2005).  Thus, no Order demanded the

production of these emails as they were not between Defendant and its employees, but rather were sent

8

by Plaintiff himself. Most importantly, however, any concern of unfair surprise, which is the policy underlying discovery requirements, is nonexistent in this case. The majority of Exhibits that Plaintiff is concerned about are messages written with his own fingers concerning his own thoughts. Any failure to produce those messages, even if constituting a technical violation, cannot create any unfair surprise or hinder the preparation of Plaintiff's case.

With regards to Exhibit E, Plaintiff's allegation that the affidavit of Ms. Holmes contains inadmissible double hearsay is wrong. Ms. Holmes recounts complaints about Plaintiff coming from other employees and managers and explains how those complaints led her to create the security bulletin to keep Plaintiff off Defendant's premises. Because Ms. Holmes is summarizing what other people said to her, Plaintiff argues that such testimony is inadmissible hearsay. In fact, Ms. Holmes' recollection of concerns and fears expressed by other employees is not hearsay as it is not being proffered to establish the truth of those concerns. Actually, whether or not Plaintiff exhibited any of the behavior described in the employee's complaints is insignificant. Instead, Ms. Holmes' recitation of those complaints is given to explain her decision-making process and the eventual drafting of the security bulletin at issue -- even if her concerns were misguided or based on faulty information. Thus, this affidavit does not fit the definition of hearsay as it is not being "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

In addition, Plaintiff devoted no time in his Motion to argument about Exhibits J and L. The Court suspects this is because the names of both Ms. Holmes and Mr. Woods had been disclosed to Plaintiff through discovery. And, as explained above, the letters from Plaintiff to Ms. Holmes in Exhibit L cannot create any unfair surprise or disadvantage for Plaintiff as he was the author of their contents. Plaintiff's Motion (Doc. No. 184) is **DENIED** and Defendant's Exhibits will be considered

by the Court.[5]

B. Summary Judgment Motions

The Court has spent great time and effort wading through the swamp of dispositive motions and responses filed by each Party. Some common deficiencies have become apparent in Plaintiff's filings. First, Plaintiff seems to think that simply alleging a cause of action will allow him to survive summary judgment. While the Court explained to both Parties in the Summary Judgment Notice (Doc. No. 187) the nature of a dispositive motion, what each party must demonstrate to survive summary judgment, exactly what the Court will consider in making its determination, and the consequences of a summary judgment motion if one is granted, Plaintiff often states that he will not provide specific evidence to prove his claims at this stage, but will wait until trial to produce it. In his Response to Defendant's Motion for Summary Judgment (Doc. No. 197) Plaintiff states that "[r]ather than provide this Court with evidence that shows he can meet all three [elements of a claim], the Plaintiff instead will address one simple issue that Morris so conveniently failed to include in its motion." But providing the Court with evidence that he can meet the legal standards of each cause of action he alleges is exactly what is required at the summary judgment stage of litigation. Having evidence at trial does Plaintiff no good if he has not established the legal requirements to get that far.

Second, but in a related vein, many of Plaintiff's filings contain more rhetoric than substance. The Court appreciates how angry Plaintiff is about his current situation and that he whole heartedly believes that Defendant is responsible. However, the purpose of the legal system is to create an organized and logical method of resolving disputes so that emotion does not get the best of people.

---

[5] Even if the Court were to strike the email messages sent from Plaintiff to Defendant's employees, the Court would reach the same conclusion in terms of the justification for creating the security bulletin based simply on the affidavit of Carol Holmes which is clearly admissible. Her affidavit explains her concerns and reasons for creating the security bulletin. The other exhibits simply present the Court with the flavor of Plaintiff's correspondence.

Despite Plaintiff's passionate unhappiness, he must fit his complaints into the legal framework of a cause of action in order to proceed with his case.

### 1. *Breach of Contract*

Although appearing as Count 5 of his Amended Complaint (Doc. No. 137), the Court will address this claim first as many other claims rely on its resolution. The contract in this case is the Separation Agreement executed by the Parties and Plaintiff contends that Defendant has breached it by failing to pay certain taxes. Specifically, Plaintiff argues that had Defendant complied with Internal Revenue Service ("IRS") regulations in calculating his severance package, the gross amount of wages would have equaled $44,000.00, rather than the $34,000.00 amount that Defendant reached, and thus, the "grossed-up" payment to Plaintiff would have been higher. Moreover, Plaintiff claims that the payment he received under the agreement should have been taxed as a bi-weekly payment and Defendant's failure to do so violated 26 U.S.C. §§ 3402 and 3403. He is upset that he, instead of Defendant, was required to pay taxes on the money he received as severance pay.

To prove a breach of contract, Plaintiff must establish 1) a valid contract existed; 2) a material breach of that contract; and 3) damages. J.J. Gumberg Co. v. Janis Serv., Inc., 847 So.2d 1048, 1049 (Fla. 4th DCA 2003). The Parties agree that the Separation Agreement is a valid contract. The dispute revolves around whether the agreement was breached. When contractual language is clear and unambiguous, the terms of that contract, as a manifestation of the parties' intent, govern the court's determination. Wagner v. Wagner, 885 So.2d 488, 492 (Fla. 1st DCA 2004). Whether ambiguity exists and the interpretation of an unambiguous contract are questions of law for the court. Rothstein v. Honeywell, Inc., 519 So.2d 1020, 1021 (Fla. 3d DCA 1987); Gainesville-Alachua County Reg'l

Airport Auth. v. R. Hyden Constr., Inc., 766 So.2d 1238, 1239 (Fla. 1st DCA 2000).[6]

The Court cannot imagine a contract that is much clearer than the Separation Agreement in question when it states that Plaintiff will be paid "a total sum of $25,987.00, an amount to which he is not otherwise entitled." (Emphasis added). The next sentence of the contract explains exactly how this figure was reached specifying that "this amount represents a 'grossed-up' separation payment minus a deduction for an existing garnishment against Miller's wages." It appears to the Court that Defendant's obligation under the Separation Agreement was very clear and Defendant met that obligation when it paid Plaintiff the exact amount specified as the "total sum" to be paid.

Plaintiff does not, in fact, dispute that the terms are unambiguous. Instead, he argues that his formulation for the proper measure of "grossed-up" wages and the proper method to tax those wages, while not explicitly written, are implicit obligations in every employment contract. Such is not the case. The terms of the Separation Agreement govern Plaintiff's severance package and they clearly dictate the amount of money Plaintiff was to receive and the method used to arrive at that number. Moreover, Plaintiff explicitly waived any claims arising from the circumstances surrounding his resignation and agreed that he did not rely on any representations or information not specifically included in the terms of the contract.[7] Finally, even if Defendant violated IRS regulations when

---

[6] Plaintiff does not agree with the use of Florida law to interpret the Separation Agreement. There does not exist, however, any federal contract law. There are endless examples of federal courts looking to state contract law when interpreting contracts - even those that waive federal statutory rights. See e.g., Jackson v. BellSouth Telecommunications, 372 F.3d 1250 (11th Cir. 2004) (employing Florida state contract law to find that plaintiffs had waived claims under federal statute).

[7] Plaintiff's indirect attempt to claim reliance on representations from Ms. Holmes that he would benefit from the tax consequences of the Separation Agreement are unavailing. He waived any claims arising from the circumstances surrounding his resignation and also testified that, while he may have had the impression that the tax implications of the severance package would benefit him, no one ever told him that Defendant would pay all the taxes on the payment. (Plaintiff Depo. at 281-82).

computing Plaintiff's severance package, which issue the Court need not consider, no private cause of action is available to Plaintiff under sections 3402 and 3403 of the federal tax withholding statutes. DiGiovanni v. City of Rochester, 680 F. Supp. 80, 82 (W.D.N.Y. 1988). Thus, "[e]ven assuming that [Plaintiff] is correct, and that the [Defendant's] withholding was not in accordance with these statutes...these provisions simply detail the obligations of the employer to the Federal Government with respect to the withholding of taxes from wages paid" and cannot be enforced by a private plaintiff. Id.

As Plaintiff cannot challenge Defendant's conformity with IRS regulations, the Court must only decide whether each party lived up to its end of the bargain. Defendant agreed to pay $25,987.00 and it did so. Thus, there is no breach of a material term of the Separation Agreement and this claim must fail.

### 2. *Breach of Duty of Good Faith and Fair Dealing*

Related to his breach of contract claim, Plaintiff contends that Defendant did not deal with him fairly or in good faith. Plaintiff then incorporates all his other claims into one by alleging that Defendant "violated the express terms of the Contract, retaliated against Mr. Miller, tortiously interfered with Mr. Miller's prospective employers, and intentionally inflicted severe emotional distress, mental anguish, destitution, and more health problems on Mr. Miller." Complaint at ¶ 56.

While this Court recognizes the implied covenant of good faith and fair dealing in every contract, see Burger King Corp. v. Weaver, 169 F.3d 1310, 1315 (11th Cir. 1999); County of Brevard v. Miorelle Eng'g, Inc., 703 So.2d 1049, 1050 (Fla. 1997), there are two limitations on this cause of action. First, the implied covenant "should not be invoked to override the express terms of the agreement between the parties." Ins. Concepts and Design, Inc. v. Healthplan Serv., Inc., 785 So.2d 1232, 1234 (Fla. 4th DCA 2001); Weaver, 169 F.3d at 1315. Second, a claim for breach of the implied duty of good faith and fair dealing cannot, under Florida law, proceed without an allegation that an

13

express term of the contract has been breached. <u>Nautica Int'l, Inc. v. Intermarine USA, L.P.</u>, 5 F. Supp.2d 1333, 1340 (S.D. Fla 1998). "A duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." <u>Healthplan Serv.</u>, 785 So.2d at 1235; <u>Hosp. Corp. of Am. v. Florida Med. Ctr., Inc.</u>, 710 So.2d 573, 575 (Fla. 4th DCA 1998).

Although Plaintiff uses the magic words "express terms of the Contract" in his Complaint, all of his motions and responses make clear that his allegation is actually that Defendant violated an implicit obligation to comply with sections of the federal tax code. Using the covenant of good faith and fair dealing to read unstated obligations into the contract would impermissibly "override the express terms of the agreement between the parties." <u>Healthplan Serv. Inc.</u>, 785 So.2d at 1234; <u>Weaver</u>, 169 F.3d at 1317-18. As the Separation Agreement is clear and Defendant has performed its express obligation under it, it has not breached its duty of good faith and fair dealing and this count must be **DISMISSED**.

### 3. *Retaliation*

Plaintiff contends that after filing a complaint with the EEOC alleging discrimination on the basis of disability, Defendant retaliated against him in violation of the ADA by giving negative references about Plaintiff to his prospective employers. This claim must also fail.

To survive summary judgment, a Plaintiff must first establish a prima facie case of retaliation by demonstrating by a preponderance of the evidence that 1) he engaged in a protected activity; 2) he endured an adverse employment action; and 3) a causal connection exists between the two. <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 346 (1997). Conclusory allegations without specific supporting facts have no probative value, for the purposes of establishing an ADA claim. <u>Hilburn v. Murata Elec. N. Am.</u>,

Inc., 181 F.3d 1220, 1228.  In addition, the causality prong of a retaliation claim is generally satisfied by demonstrating that the decision-maker was aware of the protected activity and that there was close temporal proximity between the supervisor's discovery of the protected activity and the adverse employment action. Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993); Collins v. Miami-Dade County, 361 F. Supp.2d 1362, 1373-74 (S.D. Fla. 2005).

In the present case, there is no doubt that Plaintiff's filing a complaint with the EEOC was a protected activity.  Plaintiff has not, however, demonstrated the other two elements of a prima facie case.  First, while the Court certainly acknowledges that not being able to obtain a job is adverse, Plaintiff has not proven that *Defendant* subjected him to an adverse employment action.  The adverse actions that Plaintiff complains of are alleged negative references given to his prospective employers. However, Plaintiff has put forth no admissible evidence at all that any negative references were ever given by Defendant's employees.[8]  Instead Defendant presented evidence that the employees who received calls concerning Plaintiff or those that Plaintiff believes gave negative references either did not give a negative reference or simply referred those people to Human Resources without giving a reference at all.[9]  Consequently, Defendant's evidence stands undisputed and does not leave a question

---

[8] The fact that a friend of Plaintiff's may have told him that an employee at another newspaper was told by her supervisor that Plaintiff's last employer gave Plaintiff a bad reference is inadmissible hearsay within hearsay. See Plaintiff's Depo. at 125, 128; Fed. R. Evid. 805. Plaintiff did not provide testimony of any alleged declarant by way of affidavit or deposition.

[9] Mike Richey and Jim Nasella, who Plaintiff suspects gave negative reference to Van McKenzie at the Orlando Sentinel, both contend that they have not given negative references concerning Plaintiff. (Exs. 2 and 3 to Doc. No. 183); Chet Fussman states that he made no negative references regarding Plaintiff. (Ex. 4 to Doc. No. 183); One of Plaintiff's prospective employers, Mr. Beam, actually informed Plaintiff that Mr. Fussman told him that "legally, I'm barred from saying anything positive or negative about any employee or former employee of this newspaper." (Ex. 5 of Doc. No. 183); Pat Yack, who Plaintiff accuses of giving a negative reference, has stated that he did not make a negative reference about Plaintiff. (Ex. 6 to Doc. No. 183).

of material fact.[10]

Most importantly, there is not sufficient evidence that any negative reference that was given was made in retaliation for Plaintiff's EEOC complaint.  In the most basic sense, Plaintiff cannot establish that his inability to obtain employment from the prospective newspapers was caused by negative references when he cannot prove that any negative references were given.  See Kennedy v. Kelly Temporary Serv., Inc., 95 F. Supp.2d 1288, 1296-97 (M.D. Ala. 2000).  The facts in Kennedy are nearly identical to the present case in that:

> [Plaintiff] does not know what [Plaintiff] told his prospective employers, but he does know that there were many prospectis that did not hire him, and they chose not to hire him immediately following the employment reference checks with Plaintiff.  However, Plaintiff has not pointed to any evidence that supports his argument.  Rather, he relies solely on his belief that [Defendant] gave prospective employers negative job references.  The court's independent review of the evidence reveals that the record is devoid of any facts demonstrating that Plaintiff's inability to obtain a job is connected in any way with a negative job reference from [Defendant].  The only suggestion of discrimination in this case is Plaintiff's conclusory and unsupported allegations that he was discriminated against.

So too in the present case, the sole evidence of causation is Plaintiff's hunch or speculation that because he was qualified for the positions for which he interviewed, the only explanation for not getting hired is negative references from Defendant.  The 'causal link,' however, cannot be presumed.  It must be proven by a preponderance of the evidence.  Simmons v. Camden County Bd. Of Educ., 757

---

[10] Importantly, even if Plaintiff had proven enough to assume negative references were given by Defendant, those reference would be privileged pursuant to Florida Statutes 768.095. According to that statute:

> An employer who discloses information about a former or current employee to a prospective employer of the former or current employee upon request of the prospective employer or of the former or current employee is immune from civil liability for such disclosure or its consequences unless it is shown by clear and convincing evidence that the information disclosed by the former or current employer was knowingly false or violated any civil right of the former or current employee protected under chapter 760.

F.2d 1187, 1189 (11th Cir. 1985).[11]

Instead of presenting evidence to establish the prima facie case, Plaintiff argues fervently that Defendant changed its interrogatory answers during discovery from originally stating that Pat Yack received three reference requests to later stating that three reference requests were given to three different employees. Therefore, according to Plaintiff, Defendant is guilty of perjury and cannot prevail on summary judgment. Besides the fact that parties original discovery answers often change as they sift through information more thoroughly, this discrepancy does nothing to satisfy Plaintiff's burden of establishing a prima facie case of retaliation. Moreover, allegations of perjury are misplaced in this civil action and do nothing to alter civil liability because criminal charges are reserved for prosecutions by the United States government and cannot be brought by a private plaintiff. Because Plaintiff has not established a prima facie case of retaliation by a preponderance of the evidence, his retaliation claim is **DISMISSED**.

4. *Invasion of Privacy*

Plaintiff next argues that several different actions by Defendant and its counsel have violated his privacy rights. As an initial matter, Plaintiff invokes federal privacy principles, however those are unavailable in this case because the federal case law he cites protects private citizens from invasions of privacy by the government. As he alleges invasions by Defendant, a private corporation, federal privacy law is not at play here. Instead, Plaintiff must state a claim under Florida privacy law.

Florida courts recognize invasion of privacy as an intentional tort. Purrelli v. State Farm Fire

---

[11] Plaintiff has even less argument or evidence concerning his claim that the Athens Banner-Herald failed to hire him in retaliation for his complaints and his lawsuit against Defendant. Plaintiff has proffered no evidence to establish a prima facie case of retaliation. More importantly, Plaintiff promised in the Separation Agreement "forever not to seek further employment" with any of Defendant corporation's newspapers.

17

and Cas. Co., 698 So.2d 618, 620 (Fla. 2d DCA 1997).  Under Florida law, a Plaintiff must fit his claim of invasion of privacy into the legal framework of one of four types: 1) intrusion upon plaintiff's physical solitude; 2) publication of private facts, which violates ordinary decencies: 3) putting plaintiff in a false position in the public eye; and 4) appropriation of some element of plaintiff's personality for commercial use. Phillips v. Smalley Maint. Servs., Inc., 711 F.2d 1524, 1533 (11th Cir. 1983).  The only method available to Plaintiff is publication of private facts.  Plaintiff argues that the facts also support a claim for the invasion of his seclusion or solitude, but courts have made clear that the intrusion envisioned under this route is of a physical place or of someone's quarters.  See Guin v. City of Riviera Beach, 388 So.2d 604, 606 (Fla. 4th DCA 1980); Allstate Ins. Co. v. Ginsberg, 351 F.3d 473, (11th Cir. 2003) (the intrusion is physically or electronically into one's private quarters).  As there is no allegation that Plaintiff's physical quarters have been invaded, he may not proceed under that theory.

To prove an invasion of his privacy through publication of private facts, Plaintiff must prove: 1) a public disclosure; 2) of private facts; 3) that are highly offensive to a reasonable person; and 4) the matter disclosed was not a legitimate concern to the public.  To be considered "public," the disclosure must be accompanied by publicity in the sense of communication to the public in general or to a large number of persons as distinguished from one individual or a few. Santiesteban v. Goodyear Tire & Rubber Co., 306 F.2d 9, 11 (5th Cir. 1962).  Although Defendant argues otherwise, the Court agrees with Plaintiff that his illness was a private fact.  At the time of the first alleged wrongful disclosure, Plaintiff had only recently been diagnosed and had only disclosed his illness to the supervisors that he thought needed the information and to a few close friends. (Plaintiff's Depo. at 192-96).  Plaintiff had not even told his entire family, including his own father. Id.  The litigation process has certainly

18

revealed Plaintiff's desire to keep this information secret and, in all his claims of invasion of privacy, the Court considers his illness and the medical records concerning his disorder to be private information.

a. Defendant's disclosure of Plaintiff's illness

Plaintiff argues that Defendant wrongly published his illness to both defense counsel and Mr. Van McKenzie from the Orlando Sentinel. Neither claim meets the legal requirements described above. First, any disclosure to defense counsel concerning this litigation or the prior settlement of Plaintiff's ADA complaints cannot constitute an unlawful or public disclosure as it is protected by the attorney-client privilege. This is well settled and deserves no discussion.

Although more sinister facts are involved, any disclosure to Mr. McKenzie does not constitute a public disclosure under Florida law either. During his interview with Mr. McKenzie, and without Plaintiff bringing up the subject, Mr. McKenzie began asking questions about Plaintiff's disorder. There was certainly a disclosure of private information, and Plaintiff has put forth enough circumstantial evidence to create a fact issue as to whether one of Defendant's employees was responsible for the disclosure, but it is simply not public in the sense it must be to succeed under this route. Disclosure of private information to an individual prospective employer who has a common interest in the information is not sufficiently public to constitute an invasion of privacy. See Lewis v. Snap-on Tools Corp., 708 F. Supp. 1260, 1261-63 (M.D. Fla. 1989) ("Disclosure to a small group of persons who have an obvious interest in the subject matter of the disclosure is not sufficiently public to state a cause of action for invasion of privacy."). Moreover, any disclosure is likewise protected by the privilege contained in Florida Statute 768.095. ("An employer who discloses information about a former...employee to a prospective employer...is immune from civil liability for such disclosure or its

19

consequences...").

b. forgery of Plaintiff's signature

Plaintiff's claim of invasion of privacy by forgery of his disability benefits application is likewise unsuccessful because it too was not a public disclosure of private facts. Plaintiff has simply not demonstrated any private facts that were publicized to anyone, much less a group larger than an individual or a few. The statement of his healthcare provider did not disclose the disorder he has been keeping private, but merely stated "major depression, severe, recurrent," and moreover, no evidence exists that it was publicized to anyone at all. Invasion of privacy is a "tort in which the focus is the right of a private person to be free from public gaze." Allstate Ins. Co. v. Ginsberg, 351 F.3d 473, 481 (11th Cir. 2003). The signing of Plaintiff's name, even if through forgery, does not constitute an invasion of privacy under the framework applied by Florida courts.

Plaintiff's fiery rhetoric makes clear that he is convinced that his signature was forged by Defendant's employees. The Court concedes that the circumstances surrounding his short term disability benefits application are suspicious. However, as stated before with Plaintiff's allegations of perjury, forgery is a criminal offense and not one to be heard by the Court in this civil action. Plaintiff may always contact the United States Attorney to discuss the implications of any criminal conduct. But such rhetoric and condemnation is inappropriate in this proceeding.

c. counsel's disclosure of Plaintiff's illness

Plaintiff's third argument for invasion of privacy is that Defendant's counsel publically disclosed his private medical information by disclosing it to the State Bar of Georgia. Specifically, in the summer of 2003, Plaintiff filed a grievance with the State Bar of Georgia alleging unethical conduct by Fisher & Phillips. In response to these complaints, four Fisher & Phillips attorneys filed

20

written memoranda explaining the case and their relationship with Plaintiff. As part of these responses, defense counsel explained that "[c]omplaintant states that he suffers from bi-polar disorder, and Morris certainly has not disputed that representation." According to Plaintiff, this disclosure is unlawful.

As an initial matter, and as argued in Defendant's response, this issue has already been addressed and decided by Magistrate Judge Howard when she advised Plaintiff that complaints against counsel are "outside of this judicial proceeding" and that he "should have raised his concerns to the Georgia Bar during that process." (Order No. 90). The Court agrees and adds to that discussion that any disclosure by defense counsel cannot be imputed as an unlawful disclosure by Defendant as a client.

In addition, counsel's statements to the Georgia Bar are privileged. Georgia Bar Rule 4-221(g) provides in relevant part that:

> Pleadings and oral or written statements of members of the State Disciplinary Board, members and designees of the Committee on Lawyer Impairment, special masters, Bar counsel and investigators, complainants, witnesses, and respondents and their counsel made to one another or filed in the record during any investigation, intervention, hearing or other disciplinary proceeding under this Part IV, and pertinent to the disciplinary proceeding, are made in performance of a legal and public duty, are absolutely privileged, and under no circumstance form the basis for a right of action.

The disclosure of Plaintiff's illness in counsel's responses to his Bar grievance could not fit more squarely into this privilege.[12] Plaintiff's argument that the "screening process"[13] does not constitute an

---

[12] There is no conflict, as Plaintiff suggests, between defense counsel's refusal to disclose to Plaintiff what its client revealed about his condition on the basis of the attorney-client privilege and counsel's eventual disclosure of Plaintiff's illness in response to a bar grievance. Disclosures between client and lawyer in anticipation of litigation are private and are protected. This privilege is not absolute, however, and exceptions are made. Georgia Bar Rule 4-221(g) is exactly such an exception. Attorneys must be able to defend themselves against allegations of unethical behavior without the fear that they will then face civil liability for disclosure of

investigation or a disciplinary proceeding under Rule 4-221(g) is unpersuasive. The "screening" stage

is part of the overall disciplinary process and disclosures made at this stage can "under no circumstance

form the basis for a right of action." Thus, Plaintiff suffered no invasion of privacy through counsel's

defense of themselves.

It is also worth noting that Plaintiff has made his illness an issue by filing suit under the ADA.

He cannot file legal complaints or bar grievances alleging discrimination or maltreatment on the basis

of his disability and then find objectionable the opposing party's desire to discuss the same illness that

is the basis of his suit. Plaintiff will not be permitted to use his disorder as a sword and shield.

d. service of subpoenas on Plaintiff's doctor

Plaintiff's last attempt at an invasion of privacy claim is no more successful. He argues that

Defense counsel unlawfully served a subpoena for his medical records without providing Plaintiff with

proper notice under Florida Statute 456.057. As was the case in the previous section, Magistrate Judge

Howard has already answered this question. Although recognizing that Defendant committed a

discovery violation by failing to timely notify Plaintiff of the impending service and sanctioning

Defendant accordingly, Judge Howard characterized this violation as *de minimis*. Judge Howard also

noted that harm or disadvantage to Plaintiff as a result of Defendant's failure was minimal as he was

aware the subpoena was forthcoming and has agreed to Defendant's right to the documents. As

Plaintiff's complaint is really over a technical violation of discovery obligations, and does not address

---

information protected by the attorney-client privilege.

[13] The "screening process" is that which the Geogia State disciplinary board uses to weed
out non-meritorious complaints before proceeding to a more thorough review of the complaint.
In this case, Plaintiff's complaint was halted at the screening process and the Georgia State Bar
found that no Fisher & Phillips attorney had committed any ethical violations.

substantive privacy law, these facts cannot support an invasion of privacy claim.[14]  None of the bases

under which Plaintiff attempts to establish an invasion of his privacy present questions of material fact

and thus, summary judgment for Defendant is proper.  Plaintiff's claim for invasion of privacy is

**DISMISSED**.  To the extent that Plaintiff's Objection to Magistrate Judge's Order (Doc. No. 190,

filed May 2, 2005) requests reconsideration of Order No. 179 discussed above, the Court construes it as

a motion to reconsider Doc. No. 179 and the motion is **DENIED**.

### 5.  Tortious Interference with Prospective Business Relationship

Plaintiff cannot proceed on this count either.  He alleges that Defendant tortiously interfered

with prospective business relationships by giving negative references to his prospective employers.

The elements of a tortious interference claim include: 1) existence of a business relationship; 2)

knowledge of the relationship by the defendant; 3) an intentional and unjustified interference with the

relationship; and 4) damage to the plaintiff. McFarlin v. Conseco Services, LLC., 381 F.3d 1251, 1261

(11th Cir. 2004); Hodges v. Buzzeo, 193 F. Supp.2d 1279, 1284 (M.D. Fla. 2002).  While a "business

relationship" under this formulation can be prospective, see Anthony Distrib., Inc. v. Miller Brewing

Co., 941 F. Supp. 1567, 1572 (M.D. Fla. 1996), the expectation of employment must be more than

mere hope or speculation. See St. Johns River Water Mgmt. Dist. v. Fernberg Geological Serv., Inc.,

784 So.2d 500, 504-05 (Fla. 5th DCA 2001).  In proving tortious interference with a prospective

business relationship, "[t]he test is whether there was 'an understanding between the parties [which]

would have been completed had the defendant not interfered.'" Id. at 505 (quoting Ethan Allen, Inc. v.

Georgetown Manor, Inc., 647 So.2d 812, 814 (Fla. 1994)).

Plaintiff cannot establish a prima facie case of tortious interference.  First, he has proffered no

---

[14] Even if such facts could state a claim for invasion of privacy, Plaintiff cannot establish
that Defendant's failure to give proper notice resulted in the public disclosure of a private fact.

evidence of a business relationship between he and any other newspaper with which he interviewed. His interviews alone are not enough to create an expectancy interest in a job position. His prospective business relationship appears purely speculative without any evidence of "an actual and identifiable understanding or agreement" between he and a potential employer. Jay v. Mobley, 783 So.2d 297, 299 (Fla. 4th DCA 2001).

In addition, as discussed in the section on retaliation, no evidence exists that any negative references were given by employees of Defendant. Without demonstrable evidence of such negative references, there is no showing of an "intentional and unjustified interference" with a prospective business relationship. Hodges, 193 F. Supp.2d at 1284. Without such a showing, Plaintiff cannot establish a prima facie case and, therefore, cannot survive summary judgment. Plaintiff's claim for tortious interference with a prospective advantage relationship is **DISMISSED**.

### 6. Intentional Infliction of Emotional Distress

In Count 4, Plaintiff contends that Defendant is liable for intentional infliction of emotional distress "by retaliating against him throughout the nation, indecently disclosing private facts without justification, and tortiously interfering with his prospective relationships." (Complaint at ¶ 38). Florida follows the Restatement (Second) of Torts' formulation for the tort of intentional infliction of emotional distress. A proper claim must prove: 1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous; 3) the conduct caused emotional distress; and 4) the emotional distress was severe. Williams v. Worldwide Flight SVCS., Inc., 877 So.2d 869, 870 (Fla. 3d DCA). Courts have made very clear how "outrageous" conduct must be to qualify under this tort:

"It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,'...Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

24

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

Metropolitan Life Ins. Co v. McCarson, 467 So.2d 277, 278-79 (Fla. 1985); see also R.J. v. Humana of Florida, Inc., 652 So.2d 360, 363 n. 2 (Fla. 1995) (explaining the degree of severity necessary for finding of extreme or outrageous conduct).  Moreover, as relevant to this case, courts are extremely hesitant to find conduct to be outrageous or extreme in the employment context and have limited such a finding to sexual harassment that includes verbal and physical abuse. See Lawhon v. Kinney Shoe Corp., 1998 WL 182421, *3-4 (M.D. Fla. March 27, 1998) (finding harassing comments and inappropriate touching in workplace did not amount to extreme and outrageous conduct sufficient to support claim of intentional infliction of emotional distress); DeShiro v. Branch, 1996 WL 663974, * 4 (M.D. Fla. Nov. 4, 1996) (finding sexually explicit comments, inappropriate fondling of plaintiffs` neck, shoulders, and breast, and demands to wear sexually graphic shirts were not outrageous or extreme under the definition in McCarson).

It cannot be rationally disputed that any conduct on the part of Defendant, even if improper, does not rise to the level of extreme or outrageous as set out by case law.  Plaintiff has not alleged any verbal or physical abuse by Defendants.  Any negative references given or information disclosed, even if improper, could not be considered "beyond all possible bounds of decency" or "atrocious and utterly intolerable in a civilized community." McCarson, 467 So.2d at 278-79.  Moreover, this Court has already granted summary judgment in favor of Defendant regarding much of the conduct Plaintiff considers extreme and outrageous.  If insufficient evidence exists to support a finding of unlawful behavior under those substantive torts, then it naturally follows that the same conduct cannot possibly be considered extreme or outrageous.

Finally, Plaintiff has provided no evidence of severe emotional distress.  Plaintiff has made very

clear, and the Court does not doubt his sincerity, that he is extremely upset and annoyed by

Defendant's conduct and the entire litigation process.  However, Plaintiff's tales of aggravation,

without actual evidence of how he has been emotionally impacted, cannot support a claim for extreme

emotional distress.[15]  Thus, Plaintiff's claim for intentional infliction of emotional distress must

likewise fail and is **DISMISSED**.

       7.   Defamation

     Next, Plaintiff contends that Defendant defamed his character by posting the security bulletin

bearing his pictures.  To establish such a claim in Florida, Plaintiff must show 1) the defendant

published a false statement about plaintiff; 2) to a third party; and 3) the falsity of the statement caused

injury to the plaintiff. Valencia v. Citibank Int'l., 798 So.2d 330, 330 (Fla. 3d DCA 1999); Razner v.

Wellington Reg'l Med. Ctr., Inc., 837 So.2d 437, 441 (Fla. 4th DCA 2002).  If a statement is

defamatory, the next question a court must answer is whether the statement is actionable "per se" or

"per quod." IBP, Inc. V. Hady Enterprises, Inc., 267 F. Supp.2d 1148, 1163-64 (N.D. Fla. 2002).

Statements are actionable "per se" when they degrade a plaintiff, bring him ill repute, or cause similar

injury without interpretation or innuendo. Id.  In libel per se actions, general damages are presumed.

Hood v. Connors, 419 So. 2d 742, 743 (Fla. 5th DCA 1982).  A statement is considered "per quod"

when its meaning is not readily apparent and requires innuendo or additional explanation of the

defamatory meaning. Id.; Hoch v. Rissman, Weisberg, Barrett, 742 So.2d 451, 457 (Fla. 5th DCA

1999).  In libel "per quod" actions, the plaintiff must allege and prove actual damages. Loeb v.

---

[15] And as stated before, Plaintiff's offer to bring family members to testify to his emotional condition at trial does not help him because he must prove now, at the summary judgment stage, whether he has suffered extreme emotional distress as defined by law.  With only his own personal statements and without any documented evidence of emotional impact, there is simply not enough evidence to support this claim.

Geronemus, 66 So.2d 241, 244-45 (Fla. 1953); Hoch, 742 So.2d at 457.

In the present case, the poster and the statements contained therein are not defamatory "per se."

Plaintiff himself does not allege that the statements standing alone defame him.  In fact, every

statement concerning Plaintiff was true.  Instead, Plaintiff argues that the poster, when taken as a whole

implies that he is a dangerous and "wanted" criminal.  Because looking outside the written statements

themselves and pulling from the collective instinct of society when viewing such a poster, Plaintiff

himself is employing innuendo and additional explanation to find that the poster is defamatory.[16]

Therefore, he must proceed under a libel "per quod" theory and he must prove the actual damages that

he has incurred as a result of the poster.

Plaintiff has not, however, put forward any evidence of actual damages.  Other than his own

personal statements that he has been harmed and his insistence that the poster is defamatory "per se"

such that damages are not required, he has not even addressed the issue of damages in his briefs.  The

requirement that a plaintiff prove actual damages in a "per quod" action is to ensure that liability is not

sought based on any hurtful or insensitive statement or by people who are simply not "thick skinned."

But even, as in this case, when a statement would be distressing to most people and the implication

from the statement may be completely unfounded, a showing of actual damage incurred because of its

publication is required.  Without such a showing, Plaintiff has not demonstrated an existing issue of

fact as to his defamation claim.

Even if Plaintiff had proffered some cognizable evidence of harm and could establish

---

[16] The Court would like to note that Plaintiff's inclusion of the "Wanted" poster of courthouse shooter Brian Nichols and its juxtaposition with the security bulletin at issue in this case was very persuasive.  The Court sympathizes with the emotional impact to Plaintiff of the posting of such a poster, however, sympathy is not enough to state a cause of action for defamation.

defamation, however, the security bulletin would be privileged and protected speech.  A qualified privilege exists under Florida law for defamatory statements made by one having an interest or duty in the subject matter thereof, to another person having a common interest or duty therein. Falic v. Legg Mason Wood Walker, Inc., 2004 WL 2735537 (S.D. Fla., 2004); Cape Publ'n., Inc. v. Reakes, 840 So.2d 277, 280 (Fla 5th DCA 2003).  As laid out by the Florida Supreme Court, the elements of the privilege include: 1) good faith; 2) an interest or duty in the subject by the speaker; 3) a corresponding interest or duty in the listener or reader; 4) a proper occasion; and 5) publication in a proper manner. Nodar v. Galbreath, 462 So.2d 803, 809 (Fla. 1984).  The nature of the duty giving rise to the privilege need not have the force of legal obligation, but rather may be public, personal or private, either legal, judicial, political, moral or social. Lewis v. Evans, 406 So.2d 489, 492 (Fla. 2d DCA 1981).  In addition, the question of whether a certain statement is privileged is one for the court. Nodar, 462 So.2d at 810.

Here, the Court is convinced that the security bulletin was privileged.  Defendant had received complaints from employees in the past that indicated that Plaintiff had a tendency to react badly and emotionally to conflict.  More importantly, at the time Ms. Holmes and Mr. Woods created the poster, Plaintiff was sending an enormous number of emails that were threatening in nature.  Although Plaintiff never stated that he had plans to drive to Defendant's office in Jacksonville, Florida, his emails to many different employees, including the President of Defendant corporation, were obviously filled with frustration, anger, and a desire for revenge.  Defendant not only had a right to keep unwanted people off its property, but it had an moral interest, if not a legal duty, to prevent a potentially violent confrontation on its premises.  Defendant was not required to await a direct and

specific threat from Plaintiff before taking action to protect its employees.[17]

Moreover, the Court finds that the scope of the bulletin and the method of publication were reasonable as only those people that manned the entrances to the premises were intended to see the poster. The fact that the poster somehow ended up on an employee bulletin board and was likely viewed by some non-employees does not eviscerate the privilege. Besides the fact that employees share the same interest of protecting themselves that is the subject matter of the poster, it appears to the Court that Defendant took the most reasonable steps possible to keep Plaintiff off its premises while preserving his privacy -- creating a poster with the picture of the person who should not enter, describing the vehicle he might arrive in, distributing it to security personnel and receptionists who man the entrances of the building and advising them what to do if he arrives. Furthermore, Ms Holmes and Mr. Woods testified that the poster was removed from the employee bulletin board when they learned it had been posted there.

Once the Court has determined that the privilege applies, then the statement "becomes cloaked with a legal presumption of good faith." Thomas v. Tampa Bay Downs, Inc., 761 So.2d 401, 404 (Fla. 2d DCA 2000). The privilege is not absolute, but rather, Plaintiff can overcome the presumption of good faith by demonstrating that the statement was made with actual malice. Reakes, 840 So.2d at 281. Plaintiff has proffered absolutely no evidence, however, that the creation or posting of the security bulletin was "motivated more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege." Id. Thus, the presumption remains and the poster is deemed privileged. Plaintiff's claim for defamation is **DISMISSED**.

---

[17] In fact, waiting to protect its employees could have opened Defendant to much greater liability if a confrontation between Plaintiff and any of Defendant's employees had ever occurred.

8. Fraud

Finally, Plaintiff claims that Defendant is liable for fraud in that Defendant forged his disability

benefits application and, by keeping this fact from him, fraudulently induced him to enter into the

Separation Agreement. (Complaint at ¶¶ 77-81). The elements of actionable fraud are: 1) a false

statement concerning a material fact; 2) knowledge by the person making the statement that the

representation is false; 3) the intent by the person making the statement that the representation will

induce another to act on it; and 4) reliance on the representation to the injury of the other party. Lance

v. Wade, 457 So.2d 1008, 1011 (Fla. 1984).

Assuming *arguendo* that Plaintiff's signature was forged on his application for short term

disability benefits, Plaintiff cannot establish a fraud claim because he can show neither that Ms.

Holmes, with whom he negotiated the Separation Agreement, had knowledge of the alleged forgery nor

that he relied on any representation at all regarding the benefits application when entering into the

contract. Plaintiff testified in his deposition that he had no reason to think Ms. Holmes knew about the

alleged forgery of his signature. (Plaintiff's Depo. at 334-36). Without such knowledge, she could not

posses the requisite intent to deceive Plaintiff into relying on a false statement or false signature that

she never knew existed. And naturally, if Ms. Holmes could not knowingly induce Plaintiff with any

false representation, Plaintiff could not rely on a representation that was never made.

Plaintiff is incorrect in arguing that Ms. Holmes' personal knowledge is irrelevant because she

represented Defendant as an agent. Inducement and reliance are the crux of this issue. Regardless of

whether someone at Defendant corporation knew of the alleged forgery, if the person doing the

negotiating and making the representations had no knowledge, then there could be no inducement with

a false statement. Without such inducement, there could be no reliance by Plaintiff on a false

statement.  When neither are proven, no claim for fraud exists.  That is the case here and Plaintiff's

claim for fraud is **DISMISSED**.

The Court is well aware of the unfortunate history of this case and the antagonistic relationship

between the Parties.  Neither Party is blameless here.  The Court does not condone many actions taken

by Defendant and disagrees with some business decisions, but disagreement does not create a legal

remedy unless a plaintiff can fit the facts within the framework of the law.  Plaintiff has failed to do so

here and his Complaint must be **DISMISSED WITH PREJUDICE**.

C.  Rule 11 Sanctions

Plaintiff has filed two Motions for Rule 11 Sanctions. (Doc. No. 214, filed June 13, 2005 and

Doc No. 226, filed June 27, 2005).  Defendant responded in opposition and requested its own entry of

sanctions against Plaintiff in the form of a dismissal of this action. (Doc. No. 229, filed July 8, 2005).

Plaintiff's motion is, as Defendant argues, largely a reiteration of arguments made in his previous briefs

and does not establish any basis for the imposition of sanctions against Defendant under Rule 11 of the

Federal Rules of Civil Procedure.  Thus, the Motion (Doc. No. 214) is **DENIED**.  While the Court is

dismissing this case, it is doing so on the merits and not as a sanction for improper conduct by Plaintiff.

To the extent Defendant's Response (Doc. No. 229) seeks dismissal as a sanction, it is **DENIED**.  The

litigation of this case by both Parties has been conducted without the professionalism and candor this

Court expects.  Neither Party will be awarded attorney's fees in connection with the preparation of

these motions.

D.  Defendant's Motion to Require Plaintiff to Obtain Leave of Court Before Filing Further

Motions or Related Lawsuits

As implicated by the title, Defendant seeks in this Motion (Doc. No. 220) to force Plaintiff to

seek permission from the Court before filing any other motions or lawsuits against Defendant. As Defendant's Motion for Summary Judgment has been granted and Plaintiff's Complaint has been dismissed, the present motion seems unnecessary at this time. The Motion (Doc. No. 220) is **DENIED WITHOUT PREJUDICE**. The Court will take this Motion and the arguments submitted under advisement and reconsider it at a later date if the need arises.

IV. **Conclusion**

A. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 171) is **DENIED.**

B. Defendant's Cross-Motion for Summary Judgment (Doc. No. 173) is **GRANTED.**

C. Defendant's Motion for Summary Judgment (Doc. No. 182) is **GRANTED**.

D. Plaintiff's Motion to Quash Defendant's Exhibits, Affidavit (Doc. No. 184) is **DENIED.**

E. Plaintiff's Motion for Summary Judgment (Doc. No. 186) is **DENIED.**

F. Plaintiff's Objection to Magistrate Judge's Order (Doc. No. 190) is construed as a Motion to Reconsider Doc. No. 179 and it (Doc. No. 190) is **DENIED.**

G. Plaintiff's Motion for Sanctions (Doc. No. 214) is **DENIED**.

H. Defendant's Motion to Require Plaintiff to Obtain Leave of Court Before Filing Further Motions or Related Lawsuits (Doc. No. 220) is **DENIED WITHOUT PREJUDICE.**

I. Plaintiff's Motion for Sanctions (Doc. No. 226) is **DENIED**.

J. Plaintiff's Complaint is hereby **DISMISSED WITH PREJUDICE**, each party to bear its own attorney's fees and costs.

K. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff. The Clerk shall close the file.

L. As this case has been dismissed, Plaintiff's last-minute motions (Doc. No. 241 and 243) are

**DENIED AS MOOT**.

 **DONE AND ENTERED** at Jacksonville, Florida, this 22nd day of July, 2005.

HARVEY E. SCHLESINGER
United States District Judge

Copies to:
Christopher Miller, Pro Se
Carlos J. Burreuzo, Esq.
Rhonda R. Wilcox, Esq.